**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **BRANDI ODOM,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL NO. 06-0511-WS-C** |
| | ) |
| **MOBILE INFIRMARY a/k/a** | ) |
| **INFIRMARY HEALTH SYSTEMS,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 39).  The Motion has been briefed and is ripe for disposition.[1]

**I.   Factual Background.**[2]

    **A.   *Odom's Hiring and Employment at Mobile Infirmary.***

This Title VII race discrimination and retaliation action arises from the employment relationship between plaintiff Brandi Odom, a black female, and defendant Mobile Infirmary. After obtaining her Doctor in Pharmacy degree from Xavier University of Louisiana in 2003 and while performing a residency in Hawaii in 2004, Odom contacted Mobile Infirmary to inquire as

---

[1]   In reviewing the parties' briefs, the Court notes that defendant has consistently utilized a smaller font for its footnotes than the 12-point type mandated by Local Rule 5.1(a)(2). In addition to being difficult to read, this tiny font size appears to have artificially shrunk defendant's reply brief into the 15-page limitation provided by Local Rule 7.1(b) and the applicable Rule 16(b) Scheduling Order (doc. 18, ¶ 13).  In its discretion, the Court will accept defendant's submissions in their present form; however, counsel should take care to adhere to the Local Rules in future submissions.

[2]   The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

to whether there were any openings for a pharmacist.  (Odom Dep., at 37-38, 68.)[3]  At that time, she spoke with James Easter, Director of defendant's Pharmacy Department.  (*Id.* at 68; Stembridge Dep., at 37.)  Easter informed Odom that Mobile Infirmary had closed a long-open clinical pharmacist position because of inability to fill it; however, Easter also stated that the position could be reopened to consider Odom.  (Odom Dep., at 69.)  As a result of the application process (including review of Odom's resume and an in-person interview), Easter's assessment was that Odom's credentials were impeccable and that she would be an excellent addition to Mobile Infirmary's clinical pharmacy staff.  (Easter Dep., at 24, 121.)  Ultimately, Odom was hired and began working for Mobile Infirmary as a clinical pharmacist in September 2004.  (Odom Dep., at 70.)

        To understand subsequent events, it is helpful to examine the structure of Mobile Infirmary's Pharmacy Department during the relevant time period.  The staff of that Department included approximately 30 staff pharmacists, 4 clinical pharmacists (including Odom), and 40 pharmacist technicians.  (Easter Dep., at 19-20; Odom Dep., at 81.)  The differences in duties between staff pharmacists and clinical pharmacists are murky in the record.  It appears that both staff and clinical pharmacists at Mobile Infirmary performed staff and clinical duties, but that the clinical pharmacist position was more patient-focused, in terms of leaving notes in patient charts,

---

        [3]        The Court's review of the record has been complicated by defendant's submission of at least five complete lengthy deposition transcripts, rather than simply the relevant excerpts, as required by Local Rule 5.5(c).  "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Thus, this Court will not scour uncited portions of defendant's evidentiary submission for any scrap of evidence that may advance defendant's position.  *See Preis v. Lexington Ins. Co.*, 508 F. Supp.2d 1061, 1068 (S.D. Ala. 2007) ("Parties may not, by the simple expedient of dumping a mass of evidentiary material into the record, shift to the Court the burden of identifying evidence supporting their respective positions."); *Witbeck v. Embry Riddle Aeronautical University, Inc.*, 219 F.R.D. 540, 547 (M.D. Fla. 2004) ("That judges have no duty to scour the file in search of evidence is an obvious corollary to the requirement that parties specifically identify the portions of the case file which support their assertions regarding whether genuine issues remain for trial."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (federal courts "are wary of becoming advocates who comb the record of previously available evidence and make a party's case for it").  Instead, review of the parties' submissions is restricted to the portions of the record they have cited, and the legal arguments they have expressly articulated.

consulting with physicians and recommending therapies.  (Odom Dep., at 72-73.)  What is clear, however, is that the Mobile Infirmary treated them as different positions with different compensation, and even different work areas and shifts.  (*Id.* at 73-74; Easter Dep., at 36.)  In general, Mobile Infirmary clinical pharmacists are higher paid than staff pharmacists with similar experience and years out of school.  (Easter Dep., at 36-41.)

Aside from Odom, the other clinical pharmacists employed at Mobile Infirmary as of late 2004 were Lauren Vu, Gay Herrington, and Charles Durant, each of whom had been working there for at least three years before Odom arrived.  (Defendant's First Interrog. Responses, at #14.)  None of these other clinical pharmacists are black.  (*Id.*)  Odom's direct supervisor was Vu, the team leader in charge of clinical operations for the Pharmacy Department.  (Easter Dep., at 17, 19; Odom Dep., at 75.)  Vu, in turn, reported directly to Easter.  (Easter Dep., at 15.)  At a minimum, Vu had input into hiring and firing decisions for team members assigned to her.  (Vu Dep., at 33-35.)

### B.     The Screen Saver Issue and Ensuing Discipline.

Odom spent her first several months at Mobile Infirmary in orientation, shadowing technicians and pharmacists around the facility.  (Odom Dep., at 144.)  In approximately January 2005, Odom was finally assigned to the shared office space where Vu and the other clinical pharmacists worked.  (*Id.* at 73, 144, 153; Vu Dep., at 101.)  Shortly after she was moved to the clinical pharmacy office, Odom observed a screen saver displayed on Vu's computer that she found racially offensive.  (Odom Dep., at 144.)[4]  The image on the screen saver bore the prominent caption, "slave driver," in flaming letters and depicted an illustration of a smiling Vu (the apparent slave master) standing over three black males (the apparent slaves) who were in obvious distress.  (Odom Dep., Exh 4; Plaintiff's Exh. 1.)  As for the Vu figure, a photograph of her face had been superimposed over the body of the "slave driver" in this image, such that she appeared to be the "slave driver" referenced in the caption.  One of the slaves was standing right in front of the slave driver, recoiling as she prepared to strike him with her outstretched hand.

---

[4]     Other than the screen saver, Odom denies experiencing any racially offensive comments, verbiage, images, or conduct during her employment at Mobile Infirmary, and further denies awareness that any other African-American employee in the Pharmacy Department was subjected to racial hostility or harassment.  (Odom Dep., at 85-86.)

Another knelt on the ground on all fours, his head inches above the ground as if having just been beaten or physically assaulted.  And the third slave, standing furthest away from "Vu," bore a facial expression of panic or alarm, and appeared to be on the verge of fleeing from the Vu figure.  (*Id.*)  The three slaves in the picture were labeled Bobby, Brandon, and Tramell, and near the mouth of Tramell (the figure about to be struck by the Vu figure) were the words, "no more mucomyst."  (*Id.*)

Upon noticing Odom's dismay at the sight of this racially-charged imagery on her direct supervisor's computer, two co-workers (Herrington and Durant) provided her with context, explaining that the image had been a "prank" placed on Vu's computer by an African-American intern sometime earlier.  (Odom, at 145-46.)[5]  Irrespective of the genesis of that image's uploading on Vu's computer, the record reflects that Vu had continued to display that screen saver on her computer for at least two to three years.  (Durant Dep., at 61; Vu Dep., at 104-05.)  In fact, Vu herself acknowledged that "it was on [her] computer for years."  (Vu Dep., at 105.)  Vu never removed the offending screen saver at any time, but instead displayed it on her computer until Mobile Infirmary replaced the computer in April 2005.  (*Id.* at 104-05; Stembridge Aff., ¶ 2.)[6]

The parties disagree as to what happened next, but the record in the light most favorable to Odom reflects that within a day or two after she saw the image, Vu "started randomly talking

---

[5]      The evidence reflects that the screen saver was placed on Vu's computer as a "practical joke" by a former intern named Tramell Bell.  (Durant Dep., at 53.)  Bell and two other pharmacy students spent a month working at Mobile Infirmary under Vu's tutelage sometime prior to 2003.  (*Id.* at 58, 61.)  They worked hard, and started a running joke about their dislike of preparing capsules of a drug called Mucomyst.  (*Id.* at 58.)  Bell placed the screen saver on Vu's computer on the last day of the trio's rotation "as a practical joke, implying they didn't want to make anymore Mucomyst capsules or just making light of the fact that they made Mucomyst capsules that month."  (*Id.* at 59.)

[6]      Odom's complaints to Vu about the screen saver in the first quarter of 2005 never reached William Stembridge, Mobile Infirmary's Director of Employee Relations.  In his deposition, however, Stembridge agreed that Vu should have known better than to display such an "inappropriate" screen saver, and acknowledged that he could understand why an African-American employee would complain about it.  (Stembridge Dep., at 166-67.)  Stembridge testified that if he had been aware of the screen saver, he would have had it removed, but that no one had reported the issue to him.  (*Id.*)

about her screen saver" in the presence of Odom and the other clinical pharmacists.  (Odom Dep., at 160.)  Vu explained that someone else had created the image.  In response, Odom says, "I looked at her and I said, but it's still offensive."  (*Id.* at 161.)  Odom testified that she did, in fact, find the screen saver racially offensive, inasmuch as it attempted to make a joke out of slavery.  (*Id.*)  Odom also talked to Vu about the screen saver "weeks later," reiterating her view that it was offensive.  (*Id.* at 157.)  In particular, Odom said to Vu that the screen saver was "offensive" and that Odom "did not appreciate it there."  (*Id.* at 100.)  Vu declined to discuss the matter with Odom, but instead indicated that Vu (who is Vietnamese) had herself faced offensive treatment at Mobile Infirmary on one occasion.  (*Id.* at 100, 157.)  Vu did nothing to remove the image or otherwise to address Odom's repeated complaints that it was racially offensive.  (*Id.* at 157-58.)  The screen saver disappeared only when Vu received a new laptop computer in April 2005.[7]  At no time was Vu ever disciplined by Mobile Infirmary for displaying the screen saver on her office computer for a protracted duration.  (Easter Dep., at 178.)

According to Odom, immediately after she complained about the screen saver, Vu began second-guessing and questioning everything that Odom did.  (Odom Dep., at 87-89.)  At some point, other staff members began treating Odom the same way, following Vu's lead.  (*Id.* at 90.)  Odom's testimony is that this pattern of adverse treatment "started happening right after I complained about the computer screen and I felt like it was in – in – retaliation to that ... because I did complain about it."  (*Id.*)  When asked point-blank when this second-guessing conduct began, Odom answered, "After I complained."  (*Id.*)

This second-guessing soon escalated to formal disciplinary action.  On March 10, 2005, Vu counseled Odom regarding certain performance issues, and authored a memorandum to the file.  (Stembridge Aff., Exh. A; Vu Dep., at 97.)  The issues documented in that memorandum were focused not on clinical deficiencies, but instead on Odom's mannerisms, demeanor and interpersonal interactions with physicians and staff members.  The memorandum concluded that Odom is "young, arrogant, inability to handle criticisms, and believes that she has a tremendous

---

[7]       Odom's complaints about the screen saver were not isolated to Vu, her direct supervisor.  In May 2005, Odom informed Easter, the Director of the Pharmacy Department, about the screen saver and her feelings that it was offensive.  (Odom Dep., at 142-43.)  By that point, however, the screen saver was gone, as Vu had already received a new computer.

amount of experiences even though this is not the case."  (Stembridge Aff., Exh. A.)

A pair of additional incidents occurred on May 21 and 22, 2005, in which Odom had disagreements with other staff members (one involving Odom telling someone she was too busy to help, and the other involving Odom's failure to leave her office while eating lunch to provide information to a staff pharmacist).  (Stembridge Aff., Exh. B; Odom Dep., at 106-15.)  Following these incidents, Vu and Gay Herrington (who was also a team leader) met with Odom for a coaching session, at which time they informed her that the other pharmacists believed she was "overconfident," that Odom conducted herself as if she were "superior" to others, and that she had "an attitude."  (Odom Dep., at 117-18.)  On May 25, 2005, Vu and Herrington signed a memorandum reflecting that they had met with Odom "regarding issues with enhancing her communication skills."  (Stembridge Aff., Exh. C.)  This memorandum cited Odom's "condescending attitude," "inexperience," overconfidence, lack of humility, and "overbearing attitude."  (*Id.*)  The memorandum also reflected Odom's position that she did not have problems with her communication skills, and that the issues in question were "ridiculous" and lacking in merit.  (*Id.*)  Nonetheless, the May 25 memorandum provided that Odom would be subject to a 30-day and 60-day performance review, with the threat of separation of employment if Odom failed to correct these behaviors.  (*Id.*)  Odom protested that this action was being taken without Vu and Herrington ever hearing her side of the story for these incidents.  (Odom Dep., at 122, 139-40.)

Based on her perception that she was not being treated fairly and that she was being subjected to "coaching" without Vu performing even rudimentary investigation of the underlying events, Odom wanted to meet with Easter.  (Odom Dep., at 139-40.)  She sent an email to him on the morning of May 26, 2005, requesting a meeting.  (Plaintiff's Exh. 3.)  Easter met with her promptly.  At that time, Odom informed Easter that she felt that she was not being treated fairly, that she was being discriminated against, and that she was being disciplined for events as to which her supervisor had only heard one side of the story.  (Odom Dep., at 140.)  She specifically told Easter that she believed that the coaching had been imposed because Odom is black.  (*Id.* at 141.)

By all appearances from the record, Odom successfully traversed the 60-day coaching and performance review process.  The annual evaluation prepared for her by Vu in June 2005

-6-

was generally (but not uniformly) positive.  (Plaintiff's Exh. 7; Vu Dep., at 78-79.)  On June 19, 2005, Odom received a pay raise.  (Stembridge Aff., ¶ 4.)  There do not appear to have been any further significant disciplinary measures imposed by Vu for the duration of plaintiff's employment; however, Vu's write-ups and counselings of Odom continued to accrue.  (*See generally* Plaintiff's Exh. 9.)

   *C. The Termination of Odom's Employment.*[8]

   The uncontroverted evidence in the record is that the Pharmacy Department was experiencing budgetary difficulties in the summer of 2005.  (Easter Dep., at 78.)  In particular, by May or June of 2005, it was apparent to Easter that "the department was becoming more and more out of line with expenses and revenue being fairly set from the hospital." (*Id.* at 79, 81-82.)  Simply put, the problem was that projections of patient census were not being met, such that revenues were below anticipated levels.  (*Id.* at 82-83.)  Because revenues were below projected levels, expenses needed to be reduced.  The Department's two major expenses were drugs and personnel.  (*Id.* at 83.)  As the former could not feasibly be reduced without compromising patient care, Easter and Alan Whaley, the hospital administrator, contemplated a reduction in personnel to bring expenses into line with the lower-than-expected revenues.  (*Id.* at 83-84.)  Plaintiff has offered no evidence and made no substantial argument challenging Mobile Infirmary's contention that its Pharmacy Department was significantly over-budget in summer 2005, such that Mobile Infirmary felt it necessary to conduct a reduction in force.

_____

  [8] The Court's attempts to identify record facts concerning this issue have been hampered by defendant's submission of a factual narrative in its brief supported only intermittently by record citations.  (*See* Defendant's Brief (doc. 42), at 3-4.)  As a result, the Court is left wondering what (if any) record basis might exist for certain factual allegations in defendant's brief.  The Court will not parse defendant's voluminous record submissions (defendant's exhibits exceed 300 record pages, including numerous "mini" deposition transcripts with 4 pages of testimony per record page submitted) in search of citations to support defense counsel's bare unsupported allegations as to what the facts are.  *See generally Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment."); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("opinions, allegations, and conclusory statements of counsel do not substitute for evidence"); *Williams v. Saxon Mortg. Co.*, 2008 WL 45739, *5 n.9 (S.D. Ala. Jan. 2, 2008) (similar).

To select the employee(s) to downsize, Easter and Whaley consulted a Mobile Infirmary practice that "it's always the fact that the last one hired would be the one to have to be considered to be let go." (Easter Dep., at 84.) Although Mobile Infirmary has a written policy statement concerning reductions in force, that document does not specify whether reductions in force will always be conducted in such a manner that the most recently hired employee will be the first to be laid off. (Stembridge Dep., at 66-68.) Nonetheless, Stembridge testified that this last-in, first-out approach had been used by Mobile Infirmary in previous reductions in force. (*Id.* at 72.) He also stated that defendant's reduction in force practice was that performance would be considered only if there were more than one employee with the same years of service; otherwise, performance would be irrelevant to the layoff decision. (*Id.* at 123-24.)

Ultimately, Easter and Whaley came to Stembridge and advised him that a reduction in force was necessary in the Pharmacy Department because of budgetary issues. (*Id.* at 103-04.) They proposed to Stembridge that one pharmacist position be eliminated. (*Id.* at 105.) Based on the past history of census declining and the projection of a continued decline, Stembridge concurred. (*Id.* at 119.) According to Stembridge, "It was a very small department to determine that one person had to go. [Odom] was the last person hired and so it was just a logical" conclusion that her job would be eliminated. (*Id.* at 123.) Stembridge maintained that the selection of Odom for layoff was not based on performance; indeed, Stembridge testified that he did not recall having any discussion with Easter concerning her performance, that he did not examine her personnel file in connection with the layoff decision, and that her previous Vu-imposed performance plan did not factor into the decision. (*Id.* at 123, 136, 212.) According to Stembridge, if Easter and Whaley had selected someone for the reduction in force other than the last person hired, he would "would have informed them that she was not the last person hired so, therefore, would not have been the individual that would have been affected by the reduction in force." (*Id.* at 134.) Easter's testimony on this point was consistent, inasmuch as he stated that in implementing the reduction in force, "the last pharmacist hired was the one that would have to be let go, good, bad, or ugly." (Easter Dep., at 125.) Defendant's position, then, is that the sole reason for Odom's termination in September 2005 was that "[a]t the time of the reduction in force Plaintiff was the last pharmacist hired, staff or clinical." (Defendant's Second Interrog. Responses, at #3, #7.)

-8-

But Easter and Stembridge's testimony that Odom was selected for the reduction in force solely because she was the last staff or clinical pharmacist to be hired is not uncontroverted. Indeed, Gay Herrington, one of the other pharmacist team leaders,[9] testified that "there was a point after which there was a discussion about severing our relationship with [Odom]" by Mobile Infirmary officials, although she did not specify the participants in that discussion. (Herrington Dep., at 50.)  However, Herrington's testimony was clear that she was "involved in the discussions" and was "consulted" by Mobile Infirmary concerning Vu's assessment that Odom's employment should be terminated for performance problems because counseling had failed. (*Id.* at 50-51.)  Herrington asserted that other team leaders were also consulted. (*Id.* at 52.)  When asked whether Vu had sought her opinion, Herrington cryptically answered, "it was not without input from the other team leaders and the other clinical staff that the decision was made" to fire Odom. (*Id.*)  Herrington also unequivocally agreed with the statement that, based on her own personal knowledge, Odom's performance history and write-ups by Vu "played into the ultimate decision to terminate her." (*Id.* at 53.)  A reasonable inference from Herrington's sworn testimony is that the selection of Odom for the September 2005 RIF was not based strictly on seniority, but was instead made by Vu based (at least in part) on consultation with team leaders, including Herrington, and review of the performance documentation prepared by Vu.[10]

Additionally, the record is not unambiguous as to whether Odom was or was not the last

--------

[9]     Easter testified that Herrington was in many respects an equal of Vu, inasmuch as Herrington, like Vu, "has pharmacists and technicians alike who answer to her and who she is charged to support and develop." (Easter Dep., at 112-13.)

[10]     Other witnesses contradict Herrington's account.  Specifically, Easter's testimony was that he neither consulted with Vu concerning the reduction in force nor solicited her input as to which position should be eliminated. (Easter Dep., at 102.)  When asked during her deposition which employee should have been laid off, Vu responded, "that determination would have been made by someone else other than myself," and "would be made by Mr. Easter and HR." (Vu Dep., at 134.)  Although Vu had written a memorandum that appeared to be dated September 14, 2005 criticizing Odom's performance in certain respects, Easter testified that he neither saw the memo nor factored it into the decision to lay off Odom. (Easter Dep., at 105.)  Of course, the discrepancies between Herrington's account and Vu and Easter's account of how Odom was selected cannot be resolved on summary judgment because doing so would require the Court to make credibility determinations.

-9-

staff or clinical pharmacist hired before the September 2005 reduction in force.  She does not dispute the fact that she was the least senior clinical pharmacist at Mobile Infirmary; however, she contends that a more junior staff pharmacist, Laura Floyd, should have been laid off in her stead.  Floyd (who is white) was first hired by Mobile Infirmary on June 18, 2004, or approximately three months before Odom was hired.  (Stembridge Aff., ¶ 3.)  At that time, however, Floyd was not a full-fledged staff or clinical pharmacist.  She was not hired as a pharmacist at all; rather, her job title was pharmacy practice resident, a temporary position which she held until July 2005.  (Vu Dep., at 141.)  As a resident from June 2004 through July 2005, Floyd had a much different workload than a regular pharmacist, inasmuch as the resident's duties focused on learning.  (*Id.* at 141-42.)  During her residency, Floyd was paid approximately one-third of a pharmacist's salary and was not guaranteed employment at Mobile Infirmary following her one-year residency.  (Easter Dep., at 114, 118-19.)[11]  Floyd was hired by Mobile Infirmary as a staff pharmacist in July 2005, after completing her residency.  (Vu Dep., at 142-43.)  Thus, Mobile Infirmary hired Floyd into a vacant third-shift staff pharmacist position in July 2005, approximately two months before Odom's layoff.  (*Id.* at 144-45.)  Odom was qualified and capable of performing a staff pharmacist job.  (*Id.* at 141; Easter Dep., at 78.)  However, Vu recalls no discussion about whether Odom could have been transferred into that third-shift staff pharmacist position in July 2005, rather than being laid off.  (Vu Dep., at 147.)[12]

In any case, it is undisputed that Mobile Infirmary eliminated Odom's position, and her position alone, in the September 2005 reduction in force in the Pharmacy Department.  (Easter Dep., at 126.)  No other employees were affected.  (Stembridge Dep., at 69.)  On September 25,

---

[11]    There is no particular expectation that a resident pharmacist will be offered a job by Mobile Infirmary as a clinical or staff pharmacist at the conclusion of the residency program.  (*Id.* at 118-19.)

[12]    For his part, Stembridge testified that he "never thought about" whether Odom might be able to continue working at Mobile Infirmary as a staff pharmacist.  (Stembridge Dep., at 190.)  And Easter testified that he did not offer Odom a staff pharmacist position because he "didn't have a position to offer."  (Easter Dep., at 78.)  If, as defendant argues, this decision was in the works in the summer of 2005, then there was in fact a third-shift staff pharmacist position available while the RIF was being contemplated.  Yet Mobile Infirmary neither offered that job to Odom nor closed that vacancy to forestall the need for a RIF.

2007, Mobile Infirmary provided Odom with a letter specifying that her position was being eliminated effective October 14, 2005, in light of defendant's "current and projected operational and financial environment," and inviting her to pursue other employment opportunities in defendant's system.  (Odom Dep., at Exh. 7.)  Odom never returned to work at Mobile Infirmary following her September 2005 termination.[13]

## II.      Procedural History.

The record reflects that plaintiff filed an EEOC Charge of Discrimination against Mobile Infirmary on December 29, 2005, alleging that she had been subjected to racially inappropriate behavior on several occasions while in Mobile Infirmary's employ, and that the termination of her employment was racially discriminatory and retaliatory.  (Odom Dep., at Exh. 1.)  The EEOC subsequently issued her a right-to-sue letter.  On August 30, 2006, plaintiff, by and through her then-counsel of record, filed a Complaint (doc. 1) in this District Court against Mobile Infirmary.  The Complaint delineated two causes of action.  The first was a claim of race discrimination, alleging that "Defendant's [*sic*] terminated Plaintiff on the basis of her race, in violation of her rights pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e." (Complaint, ¶ 11.)[14]  Nowhere in Count One or elsewhere in the Complaint did Odom purport to be bringing a claim of racial harassment against Mobile Infirmary; rather, by its express terms, Count One was focused exclusively on the September 2005 termination decision.

---

[13]      In its summary judgment submissions, Mobile Infirmary submits evidence concerning Odom's post-discharge conduct, including allegations that she downloaded proprietary data belonging to defendant, deleted information belonging to defendant, and attempted to dupe third parties into destroying off-site data pertaining to a research project she had done on Mobile Infirmary's behalf.  Defendant has failed to explain the relevance of this information to the legal issues presented on summary judgment.  The Court perceives none.  To the extent that defendant would taint Odom through accusations of post-discharge impropriety, such a tactic is improper.  These proceedings relate only to the lawfulness of the termination of Odom's employment.  What may have happened thereafter is of no apparent relevance.  To the extent that defendant intends to present this evidence at trial, the Court will entertain any motion in limine that plaintiff may file to exclude such evidence.

[14]      This claim was buttressed by a factual allegation that defendant's "decision of termination was made by Plaintiff's Caucasian supervisors, and was done solely on the basis of her race, for the purpose of replacing her with a less-qualified Caucasian employee." (Complaint, ¶ 6.)

In addition to the discriminatory termination claim set forth in Count One, the Complaint included a retaliation claim in Count Two, alleging that "shortly before the termination, Plaintiff protested the Defendant's display of racially offensive material on a computer screen.  In retaliation, Defendants [*sic*] promptly terminated her through elimination of her position, in violation of Title VII. ...."  (*Id.*, ¶ 13.)

Aside from the racially discriminatory discharge claim and the retaliatory discharge claim, both brought under Title VII, the Complaint interposes no other causes of action against Mobile Infirmary.[15]

### III.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should

---

[15]     The framing of Odom's claims in her Complaint echoes her EEOC Charge of Discrimination, wherein she alleged, "I believe my termination was on the basis of my race and retaliation for my complaints about racial mistreatment ....  The infirmary simply sought to terminate my position based on my race and retaliation."  (Stembridge Aff., Exh. D.)

seldom be used in employment discrimination cases because they involve issues of motivation and intent.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).  Rather, "the summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  *Id.* at 1086 (citation omitted).

## IV.  Legal Analysis.

### A.  *Racially Hostile Work Environment Claim.*

Plaintiff argues extensively in her summary judgment brief that there are triable issues on her theory that Mobile Infirmary subjected her to a racially hostile work environment.  (Doc. 50, at 10-13.)  However, such a cause of action has not been pleaded in the Complaint or otherwise properly joined in this action.  As stated *supra*, the Complaint sets forth two very specific grounds for liability, to-wit: (i) "Defendant's [*sic*] terminated Plaintiff on the basis of her race, in violation of her rights pursuant to Title VII," and (ii) "Plaintiff's termination was the result of retaliation for exercise of her protesting against the Defendant's racially hostile environment." (Doc. 1, at ¶¶ 11, 13.)  Under no reasonable reading can the Complaint be construed as placing Mobile Infirmary on notice that Odom was suing it on a theory of racial harassment in violation of Title VII; rather, the Complaint unambiguously provides that Odom's sole claims were that her termination was racially discriminatory and retaliatory.  The law of this Circuit forbids a plaintiff from amending her pleadings via arguments made in summary judgment briefs.  *See Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (having proceeded through discovery without seeking to amend complaint to reflect new theory of cause of action, plaintiff "was not entitled to raise it in the midst of summary judgment"); *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  Because Odom is seeking to inject a racial harassment claim that is not presented her Complaint long after expiration of the deadline for amending pleadings, and because Mobile Infirmary has timely objected (thereby declining to consent to the joinder of this issue for trial), plaintiff's racial harassment theory is not properly before the Court because it has not been joined in these

-13-

proceedings.[16]

Even if Odom's racial harassment claim were properly joined in these proceedings, it is untimely.[17]  A plaintiff may not sue under Title VII unless she first exhausts administrative remedies by filing a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). In a non-deferral state such as Alabama, the deadline for filing is 180 days after the alleged discriminatory act.  *See Ledbetter v. Goodyear Tire and Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005) (explaining that Alabama is a non-deferral state, such that only unlawful practices occurring within 180 days of the operative EEOC charge can give rise to Title VII liability).  "If the victim of an employer's unlawful employment practice does not file a timely complaint, the unlawful practice ceases to have legal significance, and the employer is entitled to treat the unlawful practice as if it were lawful."  *City of Hialeah, Fla. v. Rojas*, 311 F.3d 1096, 1102 (11th Cir. 2002).  In the hostile environment context, allegations outside the statutory time period may be considered only if at least one act contributing to the hostile environment took place within the applicable statutory time frame.  *See Ledbetter*, 421 F.3d at 1179.  Plaintiff's testimony is clear that the only racially offensive incident she experienced or witnessed at Mobile Infirmary

---

[16]     Stated differently, the Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2).  To satisfy the liberal pleading standard of Rule 8(a), the complaint must put the defendant "on notice as to the claim being asserted against him and the grounds on which it rests."  *Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 823 (11th Cir. 2001) (internal quotations omitted); *see also Erickson v. Pardus*, --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (Rule 8 requires only a statement that "give[s] the defendant fair notice of what the ... claim is and the grounds upon which it rests") (citation omitted).  Odom's Complaint failed to place Mobile Infirmary on notice that she was bringing a racial harassment claim against it; therefore, it is impermissible for her to solder such a claim onto this lawsuit via her summary judgment briefing.

[17]     To be clear, the Court does not endorse defendant's alternative reasoning that dismissal of this claim is warranted because the EEOC Charge fails to allege racial harassment. It certainly does.  Defendant's argument overlooks Odom's allegation in her Charge that, "During my employment I suffered several incidents of racially inappropriate behavior." (Stembridge Aff., Exh. D.)  For defendant to argue that the EEOC Charge fails to allege racial harassment is to ignore the plain language of the Charge itself.

involved the screen saver.  Moreover, the sole allegation of racial harassment cited in plaintiff's brief is Vu's screen saver; therefore, plaintiff's own construction of the claim is clear that it is grounded exclusively in that screen saver.  (*See* doc. 50, at 11-12.)  But the uncontroverted evidence in the record is that Vu's "slave driver" screen saver was never displayed after she received a new computer in April 2005.  Odom did not file her EEOC Charge until more than eight months later, in December 2005.  As such, there can be no doubt that, even if it has been joined in these proceedings, Odom's Title VII racial harassment claim against Mobile Infirmary is barred as untimely.[18]

For all of these reasons, defendant's Motion for Summary Judgment will be **granted** with respect to plaintiff's putative claim of racially hostile work environment.

---

[18]        As yet a third basis for dismissal of the racial harassment claim, the Court finds that Odom has failed to make the requisite *prima facie* showing to support such a claim.  In this Circuit, "[a] hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  While the "slave driver" screen saver was utterly inappropriate, plaintiff's mere exposure to that image, without more, fails to satisfy the requirement that defendant's conduct was sufficiently severe or pervasive to alter the conditions of her employment.  *See, e.g., Harrington v. Disney Regional Entertainment, Inc.*, 2007 WL 3036873, *12 (11th Cir. Oct. 19, 2007) (racially offensive conduct not severe or pervasive enough to be actionable under Title VII where plaintiff was called "ghetto" and once or twice overheard black co-workers being described as "monkeys"); *Godoy v. Habersham County*, 2006 WL 3592415, *2 (11th Cir. Dec. 12, 2006) (severity and pervasiveness requirement not satisfied where plaintiff's evidence was that supervisor told him to sail back to South Africa where he belongs, and where he was subject to racial slurs on occasion); *Austin v. City of Montgomery*, 2006 WL 2219726, *3 (11th Cir. Aug. 2, 2006) (co-worker's racial comments that plaintiff found offensive were not frequent or severe enough to constitute a hostile work environment).  The law is clear that Title VII "is not a general civility code, and simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007) (internal quotations and citations omitted).  The record does not contain facts to satisfy plaintiff's *prima facie* obligation to demonstrate that she was subjected to sufficiently severe and pervasive racial harassment to alter the conditions of her employment and create an abusive working environment.

**B.      Retaliation Claim.**

  1.      *Applicable Legal Standard.*

Defendant also moves for summary judgment on plaintiff's claim that her discharge constituted unlawful retaliation.  Title VII bars an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ("Retaliation is a separate violation of Title VII.").[19]  In the absence of direct evidence, Title VII retaliation claims turn on the familiar *McDonnell Douglas* burden-shifting analysis applicable to other Title VII claims.  *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  Thus, a plaintiff bears the burden of establishing a *prima facie* case of retaliation by showing that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal link between her protected activity and the adverse action.  *See Davis v. Coca-Cola Bottling Co. Consol.*, --- F.3d ----, 2008 WL 314962, *11 n.52 (11th Cir. Feb. 6, 2008); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008); *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004).  If a plaintiff makes a *prima facie* showing, then the employer must articulate a legitimate, non-retaliatory reason for the challenged decision.  *See Brochu*, 304 F.3d at 1155; *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the employer produces legitimate reasons for the adverse employment action, then the plaintiff must show that these stated reasons are pretextual.  *See Brochu*, 304 F.3d at 1155.  Of course, the ultimate burden rests on the plaintiff to show that the employer's stated reason is a pretext for unlawful retaliation.  *See Pennington*, 261 F.3d at 1266.

  2.      *Plaintiff Has Made a* Prima Facie *Showing of Retaliation.*

Defendant's position is that plaintiff cannot make the requisite *prima facie* showing.  To be sure, Mobile Infirmary concedes that Odom suffered an adverse employment action, but it

---

      [19]      *See also Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999) ("retaliation is a separate offense under Title VII; an employee need not prove the underlying claim of discrimination for the retaliation claim to succeed"); *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999) (similar).

insists that she did not engage in statutorily protected activity and cannot establish the necessary causal link.  The Court will consider each of these arguments in turn.[20]

With respect to the "protected activity" element, Mobile Infirmary's position is legally unfounded.  In this Circuit, internal complaints to supervisors concerning conduct that could reasonably be viewed as racially or sexually offensive plainly constitute protected expression under Title VII.  *See, e.g., Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001) ("[s]tatutorily protected expression includes internal complaints of sexual harassment to superiors").[21]  Here, Odom promptly complained to her immediate supervisor on multiple occasions (and later to the Director of the Pharmacy Department) that the "slave driver" screen saver displayed on the supervisor's computer was racially offensive.  That is clearly protected activity for Title VII retaliation purposes.

In arguing otherwise, Mobile Infirmary focuses on the requirement that a plaintiff "not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented."  *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d

---

[20]     The Court's analysis proceeds in recognition of the well-established principle that Odom's burden of establishing a *prima facie* case is not heavy.  *See, e.g., Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

[21]     *See also Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) ("Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment."); *Gupta*, 212 F.3d at 587 (district court correctly instructed jury that internal complaint of sexual harassment and filing of EEOC charge were activities protected by Title VII); *Carter v. University of South Alabama Children's & Women's Hosp.*, 510 F. Supp.2d 596, 608 (S.D. Ala. 2007) (recognizing "clear Eleventh Circuit precedent declaring that internal complaints of sexual harassment ... constitute statutorily protected expression under Title VII"); *Corbitt v. Home Depot USA, Inc.*, 2008 WL 616057, *16 (S.D. Ala. Mar. 3, 2008) ("Internal complaints about ... racial discrimination are statutorily-protected activities."); *Bradford v. Rent-A-Center East, Inc.*, 346 F. Supp.2d 1203, 1202 (M.D. Ala. 2004) (plaintiff's casual statement in presence of supervisor that he was passed over before promotion because of race was protected expression under Title VII); *see generally Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) (accepting district court's finding that plaintiff's internal complaint of sexual harassment constituted statutorily protected expression).

956, 960 (11th Cir. 1997).  Examining the record in the light most favorable to plaintiff, the Court readily finds that Odom has satisfied both the subjective and objective prongs.  Her deposition testimony demonstrates that she subjectively deemed the screen saver to be racially offensive, and that she mentioned it to multiple co-workers and complained to her direct supervisor promptly and repeatedly.  And examination of the screen saver confirms that Odom's reaction was objectively reasonable.  It is appalling that a supervisor in a modern-day workplace would display – for a period of several years, and within plain view of her subordinates – an image on her computer depicting herself as a smiling slave master beating and otherwise terrorizing three African-American slaves.  However innocuous the circumstances of that image's creation might have been, and regardless of whether she knew it was intended as a "joke" or a "spoof" when it was first created, it was objectively reasonable for Odom to perceive an image portraying African-American slaves suffering indignities at the hands of her direct supervisor as racially offensive and harassing.  This conclusion is reinforced by the admissions of Mobile Infirmary's Director of Employee Relations that the image was inappropriate, that Vu should have known better than to display it, that he would have ordered it removed immediately had he known it was there, and that it was understandable that Odom could find it offensive.  Defendant's summary judgment argument on protected activity is wholly without merit.[22]

Mobile Infirmary's contention that Odom cannot satisfy the "causal connection" prong of the *prima facie* test is similarly unpersuasive.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated."  *Gupta*, 212 F.3d at 590 (citation omitted); *see also Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (causal connection element of *prima facie* case requires plaintiff to prove "that the protected activity and the adverse action are not completely unrelated").  The Eleventh Circuit interprets "the causal link requirement broadly," but has stressed that "merely showing that the alleged

_____

[22]     In this regard, defendant's reliance on *Little* is misplaced.  In *Little*, the plaintiff was a white male who overheard a white male co-worker utter a racial slur to describe African-Americans.  The *Little* plaintiff tarried some eight months before reporting the incident to any supervisor.  *See Little*, 103 F.3d at 958.  Contrary to defendant's assertion, these facts do not bear even superficial resemblance to those contained in the record here.

adverse action occurred sometime after the protected expression does not establish the causation element - for temporal progression to be enough, the events must be in 'very close' proximity." *Davis*, 2008 WL 314962, at *11 n.52.

Defendant contends that plaintiff cannot satisfy this requirement because (a) she cannot show that the decision makers were aware of her protected activity and (b) there is insufficient temporal proximity between the protected activity and the termination decision. As to the former point, Mobile Infirmary is of course correct that the "causal connection" prong of the *prima facie* case requires a showing of knowledge of the protected activity. *See, e.g., Goldsmith*, 513 F.3d at 1278 ("In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (citation omitted); *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (plaintiff must "[a]t a minimum ... establish that the employer was actually aware of the protected expression at the time it took adverse employment action."). However, the evidence in the light most favorable to plaintiff is that Vu, Easter and Herrington were all involved in the decision to terminate Odom's employment (and indeed that Vu herself made the decision); and that those three individuals all had direct knowledge of Odom's protected activities.[23] There is unquestionably sufficient record evidence of the employer's knowledge of Odom's protected activity to satisfy her *prima facie* obligations on this point.

As to the latter point, defendant argues that the "casual connection" element is not

_____

[23]    Herrington's record testimony on this point is critical. She stated that Vu had decided that Odom's employment at Mobile Infirmary needed to end, that the decision to fire Odom was made with input from team leaders and clinical staff, and that the performance documentation generated by Vu figured into the ultimate decision to fire Odom. In arguing that the decisionmakers were Easter, Stembridge and Whaley, Mobile Infirmary would have this Court ignore Herrington's testimony, reasoning that "there is no clear evidence that the three actual decision makers were aware of [Vu's disciplinary actions against Odom] or considered them in their analysis of the job elimination." (Reply Brief (doc. 53), at 5 n.3.) This attempt to minimize Herrington's account cannot succeed on summary judgment. Herrington's testimony on this point may be at odds with that of Vu, Easter and Stembridge; however, on a Rule 56 motion, this Court cannot pick and choose between different defense witnesses' accounts to piece together a version of the facts most advantageous to the defense. In other words, while defendant may believe that Herrington's testimony is inaccurate, this Court is not at liberty to ignore it.

satisfied here because Odom was not laid off until September 2005, approximately four months
after she complained to Easter and seven months after she complained to Vu.  Certainly, well-
established law provides that, "[b]y itself, the three month period between [the protected
expression and the adverse action] does not allow a reasonable inference of a causal relation
between the protected expression and the adverse action."  *Higdon v. Jackson*, 393 F.3d 1211,
1221 (11th Cir. 2004); *see also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir.
2007) ("A three to four month disparity between the statutorily protected expression and the
adverse employment action is not enough.").  But close temporal proximity is not the only means
available to a plaintiff to establish a causal connection.  To the contrary, courts have routinely
found a causal connection even as to retaliatory acts occurring long after the protected activity,
where those events are temporally linked by a chain of intervening retaliatory acts.  *See, e.g.,*
*Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1117-19 (11th Cir. 2001)
(deeming causal connection element satisfied even though alleged retaliatory transfer occurred
more than one year after EEOC charge, where retaliatory actions began shortly after charge was
filed); *Wideman*, 141 F.3d at 1457 (causal connection requirement satisfied where "the series of
adverse employment actions commenced almost immediately after management learned she had
filed the charge").  Here, the evidence in the light most favorable to Odom is that the chain of
retaliatory treatment commenced immediately after she complained to Vu about the screen saver,
and that the retaliatory treatment continued until, and culminated in, her discharge seven months
later, with such discharge decision being made by (or at least in consultation with) Vu and being
based (at least in part) on Vu's negative documentation generated after the protected activity.
Reading the causal connection requirement broadly, as the Eleventh Circuit has instructed,
plaintiff's showing is sufficient to satisfy her burden of showing that her protected activity and
the termination of her employment were not wholly unrelated.

In short, the Court finds that Odom has made a *prima facie* showing of retaliation in
violation of Title VII.  Defendant's arguments to the contrary are rejected.

### 3.     *Mobile Infirmary's Legitimate Nonretaliatory Reason.*

Odom having made a *prima facie* showing of retaliatory discharge under Title VII, it
becomes incumbent on Mobile Infirmary to articulate legitimate nonretaliatory reasons for
terminating her employment in September 2005.  To satisfy this obligation, Mobile Infirmary

points to evidence in the record that a reduction in force became necessary in the Pharmacy Department in the summer of 2005 because of budgetary woes arising from lower-than-projected patient census. This evidence reflects that defendant determined that one pharmacist position needed to be eliminated, that Mobile Infirmary had an unwritten practice of laying off the most recent hires first, and that Odom was selected for layoff because she was the last to be hired, without regard to performance, discipline or any other criteria. Such a showing is plainly adequate to satisfy the employer's modest burden of production, and plaintiff does not suggest otherwise. *See Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden is exceedingly light, and is satisfied as long as employer articulates clear and reasonably specific non-discriminatory basis for its actions).

                        4.     *Pretext.*

Odom having made the requisite *prima facie* showing, and Mobile Infirmary having identified a legitimate nonretaliatory reason for the challenged action, the viability of plaintiff's Title VII retaliation claim hinges on her ability to demonstrate pretext. To create a genuine issue of material fact on the question of pretext, Odom must "demonstrate that the proffered reason was not the true reason for the employment decision." *Jackson v. State of Alabama State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005); *see also Hurlbert*, 439 F.3d at 1298 ("To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.") (internal quotations and citations omitted). She may do that "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson*, 405 F.3d at 1289. The gravamen of Odom's pretext argument is that Mobile Infirmary's stated reason for terminating her employment is not believable; therefore, in order for her retaliation claim to withstand summary judgment, her evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels*, 408 F.3d at 771 (citations omitted).

To show pretext, plaintiff keys on Mobile Infirmary's explanation that Odom was

-21-

selected pursuant to a policy that the last-hired employee would always be the first to be let go in a layoff. Two specific pieces of evidence contain troubling inconsistencies and contradictions to Mobile Infirmary's explanation. First, plaintiff points to Herrington's testimony that Vu had decided to fire Odom at some point prior to the layoff, that team leaders were consulted in the termination decision, and that the disciplinary write-ups of Odom prepared by Vu formed at least part of the basis for the selection of Odom. This testimony, by a Mobile Infirmary team leader in the Pharmacy Department, is inconsistent with defendant's explanation that the selection of Odom was based solely on her relative hire date. Second, plaintiff presents evidence that Odom was not the most recently hired pharmacist because Laura Floyd was not hired by Mobile Infirmary as a pharmacist until July 2005, some ten months after Odom was hired as a pharmacist. This evidence raises a reasonable inference that Mobile Infirmary deviated from its own stated policy of "last-in, first-out" for layoffs when it terminated Odom's employment, rather than Floyd's.[24] This evidence is also troubling because it raises an inference that Mobile

---

[24]     Defendant attempts to minimize the Floyd issue by presenting evidence that her hire date was June 2004, or several months before Odom's. But the record reveals that Floyd was originally hired for a one-year pharmacist residency program, in which she earned a small fraction of the compensation that a staff or clinical pharmacist would and performed different job duties. Then, at the end of that one-year period, in July 2005, Floyd was hired as a staff pharmacist. For purposes of Mobile Infirmary's unwritten policy, which Floyd hiring date counts, the June 2004 residency hire date or the July 2005 staff pharmacist hire date? Defendant has identified no evidence to resolve this glaring and obvious question. On the record before the Court, a jury drawing reasonable record inferences could find that the operative hire date was July 2005 because it was only then that Floyd became a pharmacist, the position at issue in the layoffs. In the absence of some evidentiary showing by defendant to negate this inference, plaintiff is entitled to its benefit on summary judgment. Nor can defendant successfully dodge the Floyd issue by asserting that Floyd worked as a staff pharmacist while Odom worked as a clinical pharmacist. The record is littered with ambiguity as to whether the RIF was performed only in the clinical pharmacist group or whether both clinical and staff pharmacists were considered. For instance, Easter testified that Mobile Infirmary considered Floyd in making the layoff decision. (Easter Dep., at 125.) In interrogatory responses, defendant stated that the reason it selected Odom was that she "was the last pharmacist hired, staff or clinical." (Defendant's Second Interrog. Responses, at #3, #7.) That evidence strongly suggests that the RIF was performed by reference to all pharmacists, not simply clinical pharmacists. Movant's principal brief also states that Odom was laid off because she "was the last pharmacist hired in at the clinical or staff pharmacist capacity." (Doc. 42, at 11.) In the face of this evidence and argument that both clinical and staff pharmacists were considered in the September 2005 RIF,

Infirmary was planning the layoff of a black pharmacist who had previously complained of racial harassment in the summer of 2005, even as it was simultaneously filling a pharmacist vacancy by hiring Floyd, a white person who had never engaged in protected activity.  If true, this timing could readily be found by a jury to smack of manipulation and pretext.

Considered collectively, these discrepancies support a reasonable inference that Odom's termination was in retaliation for her internal complaints of racial harassment.  The record facts viewed in the light most favorable to Odom tell the following story: Odom complained to her supervisor (Vu) about a racially offensive screen saver on Vu's computer in early 2005.  Vu refused to remove the offensive display, and was "out to get" Odom from that point forward.  Immediately thereafter, Vu embarked on a pattern of discipline and write-ups for Odom that she had not done previously.  Such disciplinary actions (which generally concerned squabbles between Odom and her colleagues) were often implemented without hearing Odom's side of the story and without allowing Odom so much as to review or sign the disciplinary write-up.  Vu ultimately decided that Odom should be fired.  When a reduction in force became necessary in the Pharmacy Department because of budget cuts, Vu consulted Herrington and other team leaders and staff members in the termination decision, and Vu's performance write-ups for Odom were considered in that decision.  Despite the foregoing, Mobile Infirmary announced that Odom was selected for layoff solely because she was the last pharmacist to be hired, even though (a) they actually considered Vu's input concerning performance (or Vu herself actually made the firing decision based on performance), and (b) Odom was not actually the last pharmacist to be hired.  Mobile Infirmary couched Odom's termination as a layoff even though it had hired a new pharmacist at the same time that the "layoff" decision was being made.  This set of facts, if believed by the jury at trial, could prompt a reasonable conclusion that Vu was behind the decision to fire Odom all along, that Vu's desire to fire Odom was driven by an unlawful retaliatory motive, and that the "last-in-first-out" layoff reasoning announced by Mobile Infirmary was simply a *post hoc* cover-up.

Of course, the evidence in the record also supports an inference that there was no cover-

---

defendant's summary judgment argument that Floyd's hire date is irrelevant because she worked as a different category of pharmacist than Odom must fail.

up, that Vu had nothing to do with the termination decision, and that Odom was selected for layoff solely because she had the least seniority of any clinical pharmacist. But the Court cannot select between these competing inferences on summary judgment. Because plaintiff has made a *prima facie* showing of Title VII retaliation and has produced sufficient evidence to show that Mobile Infirmary's stated reason for discharging her is not worthy of credence and is a pretext for unlawful retaliation, defendant's Motion for Summary Judgment is **denied** with respect to plaintiff's retaliatory termination cause of action.

### C.   *Racially Discriminatory Termination Claim.*

As mentioned *supra*, the Complaint includes a cause of action under Title VII alleging that Mobile Infirmary terminated Odom's employment because of her race. On summary judgment, defendant devotes at least 8 pages of its principal brief to arguing that no genuine issues of material fact remain on that cause of action. (Defendant's Brief (doc. 42), at 7-14.) Plaintiff's opposition brief, however, largely ignores this claim, offering only the conclusory statement that her discharge was "illegal discrimination based on her race" with minimal supporting facts or argument. (Plaintiff's Brief (doc. 50), at 14.)[25] Plaintiff's position appears to be that she was treated differently than a similarly situated white employee, Laura Floyd, who should have been laid off instead of Odom in the September 2005 RIF.

In the layoff context, the Eleventh Circuit has imposed an additional element, above and beyond the standard requirements (all of which are clearly satisfied here) of showing protected class, qualifications, and occurrence of an adverse employment action. To show a *prima facie* case of race discrimination in a reduction in force setting, a plaintiff must also "produce some evidence that an employer has not treated [race] neutrally, but has instead discriminated based

---

[25]     In that regard, plaintiff's brief equivocates as to whether a race discrimination claim pertaining to the termination of her employment is even in the case. In the "Background" section of her brief, plaintiff states, "This action is brought by Brandi Odom, a black female, against Mobile Infirmary for its discrimination against her for her race and for terminating her employment in retaliation for complaining about that race discrimination." (Doc. 50, at 1.) Under this formulation of the issues, the only termination-based claim asserted by plaintiff sounds in retaliation, not race discrimination. From review of plaintiff's filings as a whole, however, the Court cannot conclude that she has abandoned her claim in the Complaint for racially discriminatory discharge; therefore, that cause of action will be considered on the merits.

upon it.  Specifically, the evidence must lead the factfinder reasonably to conclude either that the defendant (1) consciously refused to consider retaining or relocating a plaintiff because of his [race], or (2) regarded [race] as a negative factor in such consideration." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005) (citation omitted); *see also Jameson v. Arrow Co.*, 75 F.3d 1528, 1532 (11th Cir. 1996) (similar).  Here, Odom's evidence is that she was treated less favorably than a similarly situated white employee, Floyd.  Specifically, as discussed *supra*, Mobile Infirmary explained that Odom was selected for layoff because she was the last clinical or staff pharmacist to be hired.  But Floyd was not hired into a staff pharmacist position until some ten months <u>after</u> Odom was hired as a clinical pharmacist.  While the record reflects that Floyd worked for Mobile Infirmary as a resident prior to Odom's hire date, divergent inferences may be drawn from the record as to whether Floyd's time as a resident "counted" under Mobile Infirmary's unwritten RIF policy.  Because there is evidence from which a reasonable factfinder could determine that Odom was singled out for reduction in force and that Mobile Infirmary violated its own policy in passing over a similarly situated (or less favorably situated) white employee to fire Odom (a black employee), plaintiff has established a *prima facie* case of race discrimination in discharge.  The same considerations create material issues of fact as to pretext, such that this claim must be submitted to the jury.  Accordingly, defendant's Motion for Summary Judgment is **denied** as to the claim for racially discriminatory discharge.

**V.     Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** that defendant's Motion for Summary Judgment (doc. 39) is **granted in part** and **denied in part**.  The Motion is **granted** with respect to plaintiff's claim for a racially hostile work environment, and that cause of action is **dismissed**.  The Motion is **denied** with respect to plaintiff's claims for racially discriminatory discharge and retaliatory discharge.  Those claims will proceed to trial.

DONE and ORDERED this 17th day of March, 2008.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE